Morgan Chu (SBN 70446)
Benjamin W. Hattenbach (SBN 186455)
Amy E. Proctor (SBN 283845)
Dominik Slusarczyk (SBN 287084)
Charlotte J. Wen (SBN 313572)
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199
Email: mchu@irell.com
Email: bhattenbach@irell.com
Email: aproctor@irell.com
Email: dslusarczyk@irell.com
Email: cwen@irell.com

(*Additional counsel listed on signature page*)

*Counsel for Plaintiff*
VLSI TECHNOLOGY LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| VLSI TECHNOLOGY LLC,<br><br>Plaintiff,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | Case No. 5:17-cv-05671-BLF-NC<br><br>**FILED UNDER SEAL**<br><br>**PLAINTIFF VLSI TECHNOLOGY LLC'S MOTION FOR SUMMARY JUDGMENT ON INTEL'S LICENSE DEFENSE AND OF NO INVALIDITY BASED ON IPR ESTOPPEL**<br><br>Date:   October 19, 2023<br>Time:   9:00 a.m.<br>Place:   Courtroom 3, 5th Floor<br>Judge:  Hon. Beth Labson Freeman |

1

## **TABLE OF CONTENTS**

2

**Page**

3   I.   LEGAL STANDARD ..................................................................................... 1

4   II.   INTEL'S LICENSE DEFENSE ...................................................................... 1

5        A.   STATEMENT OF FACTS ................................................................... 2

6        B.   ARGUMENT ......................................................................................... 4

7             1.   Intel's Defense Is Barred By Res Judicata And Collateral
                  Estoppel ....................................................................................... 4

8             a.   Res Judicata ...................................................................... 4

9             b.   Collateral Estoppel .......................................................... 6

10            2.   Intel's Defense Fails On The Merits Because VLSI Is Not A
                  Party To The Finjan Settlement And Never Agreed To Be

11                Bound By It ................................................................................. 7

12            3.   VLSI Is Also Entitled To Summary Judgment Because
                  VLSI's Patents Are Not "Finjan's Patents" As Defined In

13                The Finjan Settlement ............................................................ 12

14       C.   CONCLUSION ................................................................................... 15

15  III.  IPR ESTOPPEL ............................................................................................ 15

16       A.   STANDARD FOR ESTOPPEL UNDER 35 U.S.C. § 315(e)(2) ........ 16

17       B.   IPR ESTOPPEL BARS INTEL'S SECTION 103 OBVIOUSNESS
                 ARGUMENTS CONCERNING THE '922 AND '672 PATENTS .... 17

18
              1.   Intel Disclosed Nearly Every Prior Art Reference By June

19                 2018 ........................................................................................... 17

20            2.   Intel Reasonably Could Have Raised The Lee Book In 2018 ... 19

21            3.   Intel Improperly Attempts To Circumvent IPR Estoppel By
                  Relying On Prior Art "Products"—The Nehalem Processor

22                And P1264 Process ................................................................... 20

23            a.   Intel Relies Solely On Prior Art Publications
                       Describing Nehalem ......................................................... 22

24
              b.   Intel's Reliance On The P1264 Process Is Entirely

25                 Duplicative Of Okada And The Lee Book .................... 23

26       C.   CONCLUSION ................................................................................... 25

27

28

1

2

# <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Cases**

5

*Alliance Data Sys. Corp. v. Blackstone Cap. Partners V L.P.*,
963 A.2d 746 (Del. Ch. 2009) ............................................................................7, 8, 11

*Am. Legacy Found. v. Lorillard Tobacco Co.*,
831 A.2d 335 (Del. Ch. 2003) .......................................................................................9

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011) .....................................................................................1

*Amadeus Glob. Travel Distrib., S.A. v. Orbitz, LLC*,
302 F. Supp. 2d 329 (D. Del. 2004) ............................................................................15

*Apple, Inc. v. Cal. Inst. of Tech.*
(2023) ...........................................................................................................................17

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*,
356 F. Supp. 3d 379 (S.D.N.Y. 2019) ...................................................................11, 12

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984), 746 A.2d 244 (Del. 2000) ...............................................16

*Arrigo v. Link*,
836 F.3d 787 (7th Cir. 2016) .........................................................................................6

*Avanos Med. Sales, LLC v. Medtronic Sofamor Danek USA, Inc.*,
2021 WL 8693677 (W.D. Tenn. Oct. 8, 2021) .................................................. *passim*

*Bos. Sci. Corp. v. Cook Grp. Inc.*,
2023 WL 1452172 (S.D. Ind. Jan. 31, 2023) .................................................... *passim*

*Brown v. Felsen*,
442 U.S. 127 (1979) .......................................................................................................5

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
2019 WL 8192255 (C.D. Cal. Aug. 9, 2019) .........................................................21, 24

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
25 F.4th 976 (Fed. Cir. 2022) ....................................................................16, 17, 19, 25

*Click-to-Call Techs. LP v. Ingenio, Inc.*,
45 F.4th 1363 (Fed. Cir. 2022) ..............................................................................17, 21

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediaries, S.A.S.*, 269 F.3d 187 (3d Cir. 2001).....................................................................10, 12

*In re Enhanced Sec. Rsch., LLC*, 739 F.3d 1347 (Fed. Cir. 2014) .............................................................................23

*Hafeman v. LG Elecs., Inc.*, 2023 WL 4362863 (W.D. Tex. Apr. 14, 2023) ..........................................................21

*Intel Corp. v. Fortress Inv. Grp.*, 2021 WL 4470091 (Del. Ch. Sept. 30, 2021) ..................................................4

*Intel Corp. v. VLSI Tech. LLC*, No. IPR2018-01033 (P.T.A.B. Feb. 6, 2020)....................................................16, 18

*Intel Corp. v. VLSI Tech. LLC*, No. IPR2018-01107 (P.T.A.B. Feb. 10, 2020)..................................................16, 18

*Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274 (Fed. Cir. 2023) .............................................17, 19, 20, 25

*Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028 (Del. Ch. Nov. 7, 2013)...............................................15

*In re Klopfenstein*, 380 F.3d 1345 (Fed. Cir. 2004) .............................................................................23

*Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 4880659 (Del. Ch. Nov. 30, 2010)...............................................8

*Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 925853 (Del. Ch. Mar. 16, 2010) ...............................................12

*Marin v. HEW, Health Care Fin. Agency*, 769 F.2d 590 (9th Cir. 1985).............................................................................6

*Mars, Inc. v. TruRx LLC*, 2016 WL 4055676 (E.D. Tex. Apr. 29, 2016) ..........................................................9

*Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014 (9th Cir. 2019).............................................................................5, 6

*Meyers v. Quiz-Dia LLC*, 2017 WL 76997 (Del. Ch. Jan. 9, 2017) .............................................................11, 13

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990 (E.D. Wis. 2017) ..........................................................24

|  | **Page** |
|---|---|

*Mpoyo v. Litton Electro-Optical Sys.*,
430 F.3d 985 (9th Cir. 2005) ................................................................5, 6

*Nathan v. Fry's Elecs. Inc.*,
607 F. App'x 623 (9th Cir. 2015) ...............................................................6

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001) ......................................................................5

*Palomar Techs., Inc. v. MRSI Sys., LLC*,
2020 WL 2115625 (D. Mass. May 4, 2020) .............................................19

*Potter Voice Techs., LLC v. Apple Inc.*,
24 F. Supp. 3d 882 (N.D. Cal. 2014) ........................................................20

*In re Sears*,
536 B.R. 286 (D. Neb. 2015) .......................................................................5

*Sheehan v. AssuredPartners, Inc.*,
2020 WL 2838575 (Del. Ch. May 29, 2020) .................................8, 11, 13

*Singular Computing LLC v. Google LLC*,
2023 WL 2839282 (D. Mass. Apr. 6, 2023) .......................................19, 25

*Sioux Steel Co. v. Prairie Land Mill Wright Servs.*,
2022 WL 4132441 (N.D. Ill. Sept. 12, 2022)............................................20

*Spiro v. Vions Tech. Inc.*,
2014 WL 1245032 (Del. Ch. Mar. 24, 2014) ..............................................9

*Steen v. John Hancock Mut. Life Ins. Co.*,
106 F.3d 904 (9th Cir. 1997) .......................................................................7

*Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*,
943 F.3d 49 (1st Cir. 2019) ........................................................................15

*Taylor v. Sturgell*,
553 U.S. 880 (2008) .................................................................................5, 6

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*,
64 F.3d 773 (2d Cir. 1995) ........................................................................10

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
563 F.3d 1271 (Fed. Cir. 2009) ...................................................................9

*Truinject Corp. v. Nestle Skin Health, S.A.*,
2019 WL 6828984 (D. Del. Dec. 13, 2019) ................................................7

**Page**

*Truinject Corp. v. Nestle Skin Health, S.A.*,
  2020 WL 70981 (D. Del. Jan. 7, 2020) ................................................................8, 11

*United States v. 475 Martin Lane*,
  545 F.3d 1134 (9th Cir. 2008) ...............................................................................6

*United States v. Stauffer Chem. Co.*,
  464 U.S. 165 (1984) ...............................................................................................7

*VLSI Tech. LLC v. Intel Corp.*,
  2022 WL 1261322 (W.D. Tex. Apr. 21, 2022) ................................................. *passim*

*VLSI Tech. LLC v. Intel Corp*,
  No. 18-966-CFC (D. Del. Jan. 13, 2021 ...................................................................4

*VLSI Tech. LLC v. Intel Corp.*,
  No. 6:21-CV-57 (W.D. Tex. Apr. 21, 2022), Dkt. 701 ...........................................4

*Wasica Fin. GMbH v. Schrader Int'l, Inc.*,
  432 F. Supp. 3d 448 (D. Del. 2020) .................................................................... *passim*

*Wenske v. Blue Bell Creameries, Inc.*,
  2018 WL 5994971 (Del. Ch. Nov. 13, 2018)........................................................11

*Wi-Lan Inc. v. LG Elecs., Inc.*,
  421 F. Supp. 3d 911 (S.D. Cal. 2019) ...................................................................20

*Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*,
  2023 WL 112733 (D. Minn. Jan. 5, 2023) ............................................................21

*You Map, Inc. v. Snap Inc.*,
  2021 WL 106498 (D. Del. Jan. 12, 2021) .............................................................12

**Statutes**

35 U.S.C. § 102(a)..........................................................................................23, 27, 28

35 U.S.C. § 102(d)..............................................................................................27, 28

35 U.S.C. § 102(e)....................................................................................................27

35 U.S.C. § 103 ................................................................................................17, 18

35 U.S.C. § 311(b)..............................................................................................17, 19

35 U.S.C. § 315(e)(2)....................................................................................16, 17, 19

1

**Page**

**Rules**

Fed. R. Civ. P. 56(c)..................................................................................................1

**Other Authorities**

A. Yeoh et al., *Copper Die Bumps (First Level Interconnect) and Low-K Dielectrics in 65nm High Volume Manufacturing*, 56th Elec. Components & Tech. Conf. (2006) ..................................................................................25

Yan Li et al., *Lead-Free Solder Joint Void Evolution During Multiple Subsequent High-Temperature Reflows*, 12 *IEEE Transactions on Device & Materials Reliability* 494 (2012).........................................................................20

Ming Kong, *Experimental and Modeling Studies on Solder Self-Alignment for Optoelectronic Packaging* (2012) ...............................................................20

**\*All emphasis is added unless otherwise stated**

I.       **LEGAL STANDARD**

"Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) (citing Fed. R. Civ. P. 56(c)).

II.      **INTEL'S LICENSE DEFENSE**

VLSI hereby respectfully moves the Court for summary judgment in VLSI's favor on Intel's affirmative defense based on a purported license to VLSI's patents. Intel already unsuccessfully litigated the exact same license defense it seeks to assert here in a separate federal action between the same parties in the United States District Court for the Western District of Texas that resulted both in a court order directly refuting Intel's license defense, and also in a final judgment on the merits in favor of VLSI. *See VLSI Tech. LLC v. Intel Corp.*, 2022 WL 1261322, at *3 (W.D. Tex. Apr. 21, 2022). Intel's affirmative defense based on the purported license is therefore now barred as a matter of law by the doctrines of res judicata and collateral estoppel.

Further, even assuming for the sake of argument that the doctrines of res judicata and collateral estoppel did not apply here (which they clearly do), Intel's license defense also fails on the merits. It is premised on the incorrect theory that Intel somehow obtained a license to all of VLSI's patents (not just the particular VLSI patents asserted in this action) by virtue of a 2012 settlement agreement ("Finjan Settlement") between Intel and non-parties Finjan Software, Inc. and Finjan, Inc. ("Finjan"). However, Intel's theory ignores numerous undisputed facts that are dispositive here, including that VLSI was not even created until 2016; VLSI's creation had nothing to do with Finjan; the patents that VLSI is asserting here have nothing to do with Finjan, but rather were acquired from non-party NXP Semiconductors ("NXP"), a public company which has an ongoing financial interest in licensing proceeds received from the patents; and VLSI and Finjan are separately owned and operated entities that have nothing to do with each other beyond the fact that, since July 2020 through the present, they have each respectively been separately owned by different groups of outside investors that have invested in different investment funds managed by affiliates of non-party Fortress Investment Group LLC ("Fortress").

VLSI is therefore entitled to summary judgment on Intel's license defense for multiple

independent reasons: (1) Intel's license defense is barred by the doctrines of both res judicata and collateral estoppel because it was directly and conclusively rejected on the merits by the W.D. Texas Court, and a final judgment has been entered in that action; (2) the undisputed evidence shows VLSI is not a party to and is not bound by the 2012 settlement agreement between Intel and Finjan; and (3) in any event, VLSI's patents, which were acquired in and after 2016 from NXP, are not "Finjan's Patents" as defined by the plain language of the Finjan Settlement.

## A.      STATEMENT OF FACTS

On November 20, 2012, Intel and Finjan entered into a settlement agreement to resolve patent litigation filed by Finjan against McAfee, Inc., a company which Finjan sued for allegedly infringing various Finjan cybersecurity patents prior to Intel's acquisition of McAfee. As part of the Finjan Settlement, Finjan sold Intel a license to all "Finjan Patents," a term defined to include patents that Finjan owned or came to own within ten years of the settlement. Ex. 1 (Settlement) §§ 1.4, 1.10.

Wholly unrelated to Finjan, VLSI and its parent company CF VLSI Holdings LLC ("VLSI Holdings") were created in 2016 for the purpose of acquiring and licensing a portfolio of semiconductor patents from NXP. VLSI and VLSI Holdings were capitalized by ten different investment funds managed by Fortress, with the majority investor in VLSI Holdings being Fortress Credit Opportunities Fund IV ("FCO IV"), which is a closed-end mutual fund with hundreds of investors and $1.8 billion dollars under management as of June 30, 2022. Ex. 2 (LLC Agreement) at VLSI-18-966DE00050646; Ex. 3 (Stolarski Decl.) ¶¶ 7, 10; Ex. 4 (Zur Depo.) at 119:10–25; Ex. 5 (James Depo.) at 131:19–132:6; Ex. 6 (2022-07-11 Del. Stolarski Decl.) ¶ 5. Thus, for the sake of clarity, VLSI is 100% owned by VLSI Holdings, which in turn is owned by 10 different investment funds (with the majority owner being FCO IV), all of which are managed by Fortress. Fortress does not own VLSI. Ex. 2 at VLSI-18-966DE00050646; Ex. 3 (Stolarski Decl.) ¶ 10.

In 2016, again wholly unrelated to Finjan, VLSI and NXP entered into a Patent Purchase and Cooperation Agreement ("PPCA"), by which VLSI purchased a group of semiconductor patents that had been developed by NXP and its predecessors, and NXP agreed to cooperate in VLSI's assertion of the NXP patents against Intel and others. In exchange, NXP received a large upfront payment from VLSI, and it is also entitled to a share of licensing profits that VLSI obtains on the

1  NXP patents (as is VLSI's counsel). Ex. 3 (Stolarski Decl.) ¶ 4; Ex. 8 (Stolarski Depo.) at 227:24–
2  228:20; Ex. 9 (Stolarski Depo.) at 146:12–14, 148:22–149:3; Ex. 10 (PPCA) at §§ 2.1, 7.3.

3      In October 2017, VLSI filed this action against Intel asserting several of the NXP patents.
4  VLSI subsequently filed a separate patent infringement action against Intel on other NXP patents in
5  the District of Delaware, as well as three more patent infringement actions against Intel on NXP
6  patents in W.D. Texas.[1] All of the later four district court actions initiated by VLSI against Intel
7  have already been largely resolved at the trial court level: the first W.D. Texas case resulted in a
8  $2.18 billion jury verdict and subsequent judgment in favor of VLSI, which Intel has appealed to
9  the Federal Circuit; the second W.D. Texas case resulted in a defense verdict for Intel; the third
10  W.D. Texas case resulted in a $949 million jury verdict in favor of VLSI that is presently at the
11  post-trial motion stage; and the Delaware suit was dismissed on December 27, 2022 by mutual
12  agreement of the parties before any trial date had been set.

13      Wholly unrelated to VLSI, in July 2020, Finjan Holdings, Inc., the parent company of the
14  Finjan entities, merged with CFIP Goldfish Holding LLP ("Goldfish"). Ex. 11 (Merger Agreement)
15  at 1, 13; Ex. 12 (Offer Statement) at 10, 26; Ex. 3 (Stolarski Decl.) ¶ 8; Ex. 13 (Hartstein Depo.) at
16  17:4–18. Public documents show that entities called Fortress Credit Opportunities Fund V (A) L.P.
17  and Fortress Intellectual Property Fund I (A) LP provided equity financing for the merger. Ex. 3
18  (Stolarski Decl.) ¶ 8. But neither of those entities, nor any of the other entities named in public
19  documents as having been involved in the Finjan merger, is among the ten investment funds
20  managed by Fortress that are invested in VLSI Holdings. Ex. 2 (LLC Agreement) at VLSI-18-
21  966DE00050646; Ex. 15 (Goldfish LLC Agreement) at FIG0002109; Ex. 11 (Merger Agreement)
22  at § 4.04; Ex. 12 (Offer Statement) at 155; Ex. 14 (Certificate of Registration); Ex. 3 (Stolarski
23  Decl.) ¶ 9; Ex. 5 (James Depo.) at 107:8–24, 117:4–9.

24      Simply put, VLSI has nothing to do with Finjan, and VLSI had no involvement with the
25  Finjan Merger. Ex. 3 (Stolarski Decl.) ¶ 9; Ex. 13 (Hartstein Depo.) at 96:16–20; Ex. 18 (Offer
26  Statement) at 155. VLSI has no ownership interest in Finjan or Goldfish, and Finjan and Goldfish

27

28  [1] VLSI has also asserted multiple NXP patents against Intel in pending litigation in China.

1    have no ownership interest or business relationship with VLSI. Ex. 13 (Hartstein Depo.) at 96:21-
2    97:8; Ex. 2 (LLC Agreement) at VLSI-18-966DE00050646.

3         Intel initially asserted its license defense on September 2, 2020 in the parties' action in W.D.
4    Texas, and subsequently asserted the same license theory in the parties' District of Delaware action
5    (September 11, 2020), and then in Delaware Chancery Court (January 11, 2021), and finally in this
6    Court (December 15, 2021, ECF 300-01). As the W.D. Texas Court observed, Intel initially had
7    little interest in obtaining a merits ruling on its purported license defense, but instead primarily
8    sought to use the license defense as a means to delay the W.D. Texas cases that were then nearing
9    trial. 2022 WL 1261322, at *2 (finding that Intel's assertion of the license issue "resembles more of
10   a tactic to delay trial rather than a good faith basis for adding its defense"); *see also Intel Corp. v.*
11   *Fortress Inv. Grp.*, 2021 WL 4470091, at *8 (Del. Ch. Sept. 30, 2021) ("Intel's choice not to
12   promptly pursue those defenses in every Infringement Action does not change or blur the boundary
13   of this Court's equitable jurisdiction."); Ex. 16 (Memorandum Order, *VLSI Tech. LLC v. Intel Corp*,
14   No. 18-966-CFC (D. Del. Jan. 13, 2021), Dkt. 675 ) at 7.

15        In April 2022, the W.D. Texas Court entered a detailed order with findings squarely refuting
16   Intel's license defense on the merits, and then subsequently entered final judgment in favor of VLSI.
17   2022 WL 1261322, at *2–3; Ex. 17 (Final Judgment, *VLSI Tech. LLC v. Intel Corp.*, No. 6:21-CV-
18   57 (W.D. Tex. Apr. 21, 2022), Dkt. 701).

19        **B.    ARGUMENT**

20             **1.    Intel's Defense Is Barred By Res Judicata And Collateral Estoppel**

21        The W.D. Texas Court's April 21, 2022 order finding Intel's license defense to be without
22   merit and that Court's subsequent final judgment are dispositive here, precluding Intel's affirmative
23   license defense under both the doctrines of res judicata and collateral estoppel.

24             *a.    Res Judicata*

25        In the parties' W.D. Texas case, Intel asserted the exact same license defense that it asserts
26   here, namely that Intel supposedly obtained a license to all of the patents that VLSI acquired from
27   NXP in and after 2016 by virtue of Intel's 2012 settlement with Finjan. Ex. 18 (W.D. Tex. Dkt. 188)
28   at 1–6; Ex. 19 (W.D. Tex. Dkt. 349) at 1, 4. The W.D. Texas Court thoroughly analyzed and refuted

1    Intel's license theory in its April 21, 2022 Order, finding (among other things) that: 1) VLSI is not

2    a party to the Finjan Settlement, 2) VLSI is not owned or controlled by any of the parties to the

3    Finjan Settlement, and 3) under Delaware law and the plain terms of the Finjan Settlement, VLSI is

4    not an affiliate of Finjan. *VLSI Tech. LLC*, 2022 WL 1261322, at *2. The W.D. Texas Court further

5    found that "VLSI has no relationship to Finjan whatsoever" and "Finjan did not own the asserted

6    patents at the time of the Finjan License" (or ever), and that "the asserted paten[t]s in this case could

7    not have been licensed to Intel." *Id.* at *3.

8         Any attempt by Intel to re-litigate its license defense here is now barred by res judicata, and

9    would constitute an improper collateral attack on the judgment of another federal district court. *See,*

10   *e.g.*, *Brown v. Felsen*, 442 U.S. 127, 131 (1979) ("Res judicata prevents litigation of all grounds for,

11   or defenses to, recovery that were previously available to the parties, regardless of whether they

12   were asserted or determined in the prior proceeding."); *Media Rts. Techs., Inc. v. Microsoft Corp.*,

13   922 F.3d 1014, 1020 (9th Cir. 2019) ("Claim preclusion bars a party in successive litigation from

14   pursuing claims that 'were raised or could have been raised in [a] prior action.'" (quoting *Owens v.*

15   *Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001))); *In re Sears*, 536 B.R. 286,

16   303 (D. Neb. 2015) ("The res judicata doctrine also applies to defenses."), *aff'd*, 863 F.3d 973 (8th

17   Cir. 2017). Res judicata works to "protect against 'the expense and vexation attending multiple

18   lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the

19   possibility of inconsistent decisions.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (alterations

20   original). Accordingly, res judicata applies when "the earlier suit . . . (1) involved the same 'claim'

21   or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved

22   identical parties or privies." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005).

23        There can be no dispute that Intel is seeking to re-litigate in this action the same license

24   defense that the W.D. Texas Court already squarely rejected. Intel's license theory here involves the

25   same defense to VLSI's patents acquired from NXP arising out of the same exact licensing

26   agreement with Finjan, covering the same purported rights and obligations, and predicated on

27   "substantially the same evidence." *See id.*; Ex. 18 (W.D. Tex. Dkt. 188) at 1–6; Ex. 19 (W.D. Tex.

28   Dkt. 349) at 1, 4. Furthermore, the W.D. Texas Court's adverse findings on Intel's license defense

1  and subsequent entry of judgment against Intel plainly constitute a final judgment on the merits for

2  purposes of res judicata. *E.g.*, *Nathan v. Fry's Elecs. Inc.*, 607 F. App'x 623, 624 (9th Cir. 2015)

3  ("Upon entry of final judgment, 'the interlocutory order merges in the final judgment[.]'" (quoting

4  *United States v. 475 Martin Lane*, 545 F.3d 1134, 1141 (9th Cir. 2008))).

5          In this regard, not only "could [Intel's licensing defense] have been raised" in the W.D.

6  Texas case, but the W.D. Texas Court explicitly considered and rejected Intel's license defense and

7  made multiple findings against Intel. *E.g.*, *Arrigo v. Link*, 836 F.3d 787, 799 (7th Cir. 2016) ("[The]

8  circuits have uniformly found that res judicata applies" after "denial of a motion to amend." (citing

9  *Christman v. Saint Lucie Cty., Fla.*, 509 Fed. App'x 878, 879 (11th Cir. 2013); *Hatch v. Trail King*

10  *Indus., Inc.*, 699 F.3d 38, 45–46 (1st Cir. 2012); *King v. Hoover Grp., Inc.*, 958 F.2d 219, 222–23

11  (8th Cir. 1992))); *see also Marin v. HEW, Health Care Fin. Agency*, 769 F.2d 590, 593 (9th Cir.

12  1985) (finding res judicata applied where motion to amend was denied with prejudice). VLSI is thus

13  entitled to summary judgment of Intel's license defense under the doctrine of res judicata.

14                              *b.      Collateral Estoppel*

15          Separately and additionally, Intel's license defense is also precluded by the doctrine of

16  collateral estoppel because the W.D. Texas Court already squarely decided key factual and legal

17  questions essential to the defense. *See Media Rts. Techs.*, 922 F.3d at 1020 ("Issue preclusion . . .

18  bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court

19  determination essential to the prior judgment[.]'" (quoting *Taylor*, 553 U.S. at 892)).

20          In its briefing in W.D. Texas, Intel asserted many of the same legal and factual arguments it

21  seeks to advance here in support of its license defense, including that Fortress supposedly has

22  "control" over VLSI, that VLSI is therefore an "affiliate" of Finjan, and that VLSI's patents are

23  therefore "Finjan's Patents." Ex. 19 (W.D. Tex. Dkt. 349) at 4; Ex. 18 (W.D. Tex. Dkt. 188) at 1–

24  6. But the W.D. Texas Court already explicitly considered and rejected these very arguments, and

25  the W.D. Texas Court's findings on these issues were an essential part of its analysis and reasoning

26  in ruling against Intel. 2022 WL 1261322, at *2–3.

27          Among the key findings by the W.D. Texas Court in ruling against Intel's license defense

28  were that: (1) VLSI is not a party to the Finjan Settlement, (2) VLSI is not owned or controlled by

1  any of party to the Finjan Settlement, (3) under Delaware law and the terms of the Finjan Settlement,

2  VLSI is not an affiliate of Finjan, and (4) "the asserted paten[t]s . . . could not have been licensed to

3  Intel" under Delaware law. *Id*. at *3. Under collateral estoppel, Intel is now barred as a matter of

4  law from re-litigating *any* of these findings. *E.g.*, *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d

5  904, 910 (9th Cir. 1997) ("[T]he doctrine of collateral estoppel can apply to preclude relitigation of

6  both issues of law and issues of fact if those issues were conclusively determined in a prior action."

7  (quoting *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170–71 (1984))).

8      VLSI is therefore also entitled to summary judgment of Intel's license defense under the

9  doctrine of collateral estoppel.

10      **2.    Intel's Defense Fails On The Merits Because VLSI Is Not A Party To**

11            **The Finjan Settlement And Never Agreed To Be Bound By It**

12      The doctrines of res judicata and collateral estoppel are dispositive here, and this Court need

13  not reach any further issues before entering summary judgment for VLSI on Intel's license defense.

14  However, even assuming for the sake of argument that res judicata and collateral estoppel did not

15  apply here (which they do), Intel's license defense plainly fails on the merits for multiple reasons.

16      First, as the W.D. Texas Court correctly found, black letter Delaware law (which is the

17  choice of law set forth in the Finjan Settlement, Ex. 1 at § 11.4) provides that a non-party to a

18  contract (such as VLSI with respect to the Finjan Settlement) is not bound by that contract, absent

19  unusual circumstances not present here. *E.g., Truinject Corp. v. Nestle Skin Health, S.A.*, 2019 WL

20  6828984, at *9–10 (D. Del. Dec. 13, 2019) (finding that non-signatory parent company was not

21  bound to agreement entered into by subsidiary despite agreement purporting to bind "Affiliates" as

22  well as signatories); *Alliance Data Sys. Corp. v. Blackstone Cap. Partners V L.P.*, 963 A.2d 746,

23  760 (Del. Ch. 2009) (finding nonsignatory parent company not bound to agreement entered into by

24  subsidiary because "the ordinary rule is that only the formal parties to a contract are bound by its

25  terms"); *Sheehan v. AssuredPartners, Inc.,* 2020 WL 2838575, at *9 (Del. Ch. May 29, 2020)

26  (finding non-signatory parent company not bound to agreement entered into by subsidiary even

27  though agreement defined subsidiary as including "affiliates, subsidiaries, [and] parent

28  companies"); *Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 4880659, at *3 (Del. Ch. Nov. 30, 2010)

1   (finding arbitration clause not binding on non-signatory affiliate); *VLSI*, 2022 WL 1261322, at *3

2   ("Delaware law provides that a non-party to a contract is not bound by that contract.").

3        Here, the undisputed facts show that VLSI is not a party to or bound by the Finjan Settlement.

4   *See also VLSI*, 2022 WL 1261322, at *3. As an initial matter, "Intel Corporation," "Finjan Software,

5   Inc.," and "Finjan, Inc." are the only entities that signed the Finjan Settlement, and those three

6   entities are specifically defined in the Finjan Settlement as the only "Party" and "Parties" to the

7   agreement. Ex. 1 (Settlement) at 15 & §§ 1.11, 1.12. VLSI is indisputably not a signatory to or

8   named in the agreement.[2] *Id.* Neither is Fortress. *Id.* It is therefore clear from the face of the Finjan

9   Settlement itself that VLSI is not a party to the agreement. *E.g., Alliance Data Sys.*, 963 A.2d at

10  760–61 ("The Merger Agreement was only signed by three parties[.] . . . Accordingly, only those

11  three parties had obligations under that Agreement."); *Truinject Corp. v. Nestle Skin Health, S.A.*,

12  2020 WL 70981, at *12 (D. Del. Jan. 7, 2020).

13       The conclusion that VLSI is not a party to or bound by the Finjan Settlement is further

14  supported by the following undisputed facts: VLSI did not even exist until 2016, four years after the

15  Finjan Settlement was signed, and VLSI's creation had nothing to do with Finjan. Ex. 2 (LLC

16  Agreement) at VLSI-18-966DE00050638; Ex. 4 (Stolarski Decl.) ¶ 3. Moreover, Finjan does not

17  own (and has never owned) VLSI, and likewise VLSI has no ownership interest in Finjan. Ex. 13

18  (Hartstein Depo.) at 96:21–97:8; Ex. 2 (LLC Agreement) at VLSI-18-966DE00050646. Further, all

19  of the patents that VLSI owns and is asserting originated with NXP, not Finjan. Dkt. 334-00 at

20  ¶¶ 149–50; Ex. 3 (Stolarski Decl.) ¶¶ 4, 11; Ex. 13 (Hartstein Depo.) at 99:10–14; Ex. 20 (Anderson

21  Depo.) at 90:21–25; Ex. 21 (Stabinsky Depo.) at 88:9–11.

22       In short, the Finjan Settlement is a contract between Finjan and Intel. VLSI has never been

23  a party to nor bound by it. And even assuming for the sake of argument that Finjan had promised to

24  give Intel a license to VLSI's patents (which the Finjan Settlement does not do), Finjan never had

25  the ability to bind VLSI to any patent license for the simple reason that one cannot sell that which

26  they do not own. *E.g., TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275

27

28  [2] In addition to not being a signatory or named party, VLSI is not an affiliate of Finjan.

1  (Fed. Cir. 2009) ("[O]ur analysis begins with the premise that one cannot convey what one does not

2  own. This principle is particularly important in patent licensing[.]"); *Spiro v. Vions Tech. Inc.*, 2014

3  WL 1245032, at *4 n.13 (Del. Ch. Mar. 24, 2014) ("[A]n owner or licensee of a patent cannot

4  convey that which it does not possess."); *Mars, Inc. v. TruRx LLC*, 2016 WL 4055676, at *3 (E.D.

5  Tex. Apr. 29, 2016) ("[R]esolution of this issue 'requires nothing more than the application of a

6  rather straightforward principle'—a party cannot release claims it does not own."); *see also VLSI*,

7  2022 WL 1261322, at *3 ("[Finjan] could not have licensed something it did not own.").

8         Because VLSI is not a party to the Finjan Settlement, Intel has the burden of showing that

9  this case fits within one of the narrow exceptions where non-parties can be bound to a contract, such

10  as where a non-party later adopts or assumes the contract. *E.g., Am. Legacy Found. v. Lorillard*

11  *Tobacco Co.*, 831 A.2d 335, 344 (Del. Ch. 2003). But here, the undisputed facts show that no such

12  exception applies. VLSI has no relationship with Finjan, was not involved in the 2020 merger

13  between Finjan and Goldfish, and was not even aware of the Finjan Settlement until Intel raised the

14  issue after that merger was already complete. *VLSI*, 2022 WL 1261322, at *3 ("VLSI has no

15  relationship to Finjan whatsoever."). Moreover, when VLSI became aware of the Finjan Settlement,

16  VLSI promptly confirmed in writing that VLSI is not a party to or bound by the Finjan Settlement.

17         Furthermore, VLSI has never taken any action nor made any statement that could reasonably

18  be construed as VLSI agreeing to be bound by the Finjan Settlement.[3] Ex. 3 (Stolarski Decl.) ¶ 6;

19  Ex. 6 (Stolarski Depo.) at 120:9–11; Ex. 13 (Hartstein Depo.) at 98:17–22; Ex. 5 (James Depo.) at

20  143:10–18; Ex. 21 (Stabinsky Depo.) at 46:6–10; Ex. 23 (Lee Letter) at 2; Ex. 24 (Hattenbach-

21  Tompros Emails). Similarly, Intel cannot show that VLSI adopted the Finjan Settlement by using

22  the agreement to affirmatively extract a benefit from Intel—VLSI never did any such thing. *E.g.,*

23  *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediaries, S.A.S.*, 269 F.3d

24  187, 200 (3d Cir. 2001); *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir.

25  1995). To the contrary, VLSI has consistently taken the position that VLSI is not a party to nor

26

27  ———————————————
   [3] Intel cannot even show that non-parties Fortress or Goldfish agreed to be bound by the Finjan

28  Settlement, let alone that VLSI agreed. Ex. 11 (Merger Agreement) at §§ 4.07, 10.08, & 10.12(b).

1    bound by the Finjan Settlement. Ex. 3 (Stolarski Decl.) ¶ 6; Ex. 6 (Stolarski Depo.) at 120:9–11; Ex.

2    13 (Hartstein Depo.) at 98:17–22; Ex. 5 (James Depo.) at 143:10–18; Ex. 21 (Stabinsky Depo.) at

3    46:6–10; Ex. 23 ; Ex. 24 . Nor has VLSI accepted any benefits from the Finjan Settlement, such as

4    payments or transfers of value from Finjan or Intel.[4] Ex. 21 (Stabinsky Depo.) at 39:19–24; Ex. 3

5    (Stolarski Decl.) ¶ 6; Ex. 13 (Hartstein Depo.) at 99:5–9; Ex. 24 (Hattenbach-Tompros Emails).

6          Unable to prove that VLSI ever agreed to be bound by the Finjan Settlement, Intel incorrectly

7    contends that VLSI should nonetheless be deemed bound because of circular language in the

8    preamble of the 2012 agreement stating that Finjan Software, Inc. and Finjan Inc. were "each signing

9    on their own behalf and on behalf of their respective Affiliates," with "Affiliates" subsequently

10   defined to include future "Affiliates." Ex. 1 (Settlement) at Preamble & § 1.2. Intel contends that

11   applying this circular language, both VLSI and Finjan are now purportedly "Affiliates" of Fortress,

12   and therefore also "Affiliates" of each other. Thus, according to Intel, the term "Finjan" in the Finjan

13   Settlement actually includes VLSI, because VLSI is now purportedly a Finjan "Affiliate."

14         VLSI notes that Intel is effectively arguing that the Court should treat VLSI and nonparties

15   Finjan and Fortress as alter egos of each other for purposes of the Finjan Settlement. Delaware courts

16   have consistently rejected similar efforts to disregard the separate legal nature of each entity, even

17   when the entities are far more closely connected than are VLSI and Finjan here. *E.g.*, *Alliance Data*

18   *Sys. Corp.*, 963 A.2d at 769 ("Delaware law respects corporate formalities, absent a basis for veil-

19   piercing[.]"); *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *7 (Del. Ch. Nov. 13,

20   2018). Moreover, numerous courts in Delaware and other jurisdictions have directly rejected the

21   same and similar arguments as Intel has advanced here seeking to bind non-parties to a contract

22   signed by an affiliate. *E.g., Truinject Corp.*, 2020 WL 70981, at *12 (provision purporting to bind

23

24   [4] Intel's self-serving contention that Intel has unilaterally chosen to "benefit" VLSI under the Finjan

25   Settlement by not preemptively challenging VLSI's other patents (something Intel never did even

26   *before* it asserted its purported license defense) is belied by the lack of any supporting evidence.

27   Further, Intel's unilateral decision not to challenge other VLSI patents cannot and does not mean

28   that Intel therefore now has a free license to all of VLSI's patents by virtue of the Finjan Settlement.

1    "Affiliates" insufficient to bind non-signatory affiliate where signatory lacked actual or apparent

2    authority to sign on its affiliate's behalf); *Sheehan*, 2020 WL 2838575, at *9 (reference to non-

3    signatory entities in contract's definition of a party "does not transform these entities into parties to

4    the [agreement]" with "obligations thereunder"); *Meyers v. Quiz-Dia LLC*, 2017 WL 76997, at *6

5    (Del. Ch. Jan. 9, 2017) (rejecting argument that language in agreement preamble stating that QCE

6    signed "on behalf of . . . subsidiaries" meant that "when the agreement references QCE or QCE

7    LLC, the obligation runs not only to that entity but also to . . . [nonsignatory] subsidiaries"); *Arcadia*

8    *Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 393 (S.D.N.Y. 2019).

9         For example, in *Alliance Data Systems*, 963 A.2d at 760–61, the Chancery Court refused to

10   bind a private equity fund to an agreement entered into by a subsidiary it created to effectuate a

11   merger. The parent company never signed the agreement in question and was not included in the

12   agreement's definition of "Parties." *Id*. at 753. However, unlike here, the parent company actually

13   knew of the agreement in question and had even created one of the parties for the express purpose

14   of entering into the agreement. Nonetheless, the Chancery Court refused to bind the non-signatory,

15   recognizing that "Delaware law respects corporate formalities" and a "huge amount of wealth

16   generation results from the use of distinct entities by corporate parents to conduct business." *Id*. at

17   769. As a result, "[Alliance] is only entitled to what it was promised from ***the entities that made***

18   ***those promises***," i.e., the entities that signed the agreement. *Id*. at 768.

19        By contrast, Intel has not cited even a single case involving closely analogous facts in which

20   a patent license agreement was found to be binding on a non-party to the contract.

21        Simply put, VLSI has never agreed to be bound by the Finjan Settlement, and Intel cannot

22   carry its burden of proof to show otherwise. *E.g.*, *Arcadia*, 356 F.Supp.3d at 390 (finding that even

23   where an "agreement purport[s] to bind successors and assigns of the parties to the agreement, an

24   assignee or successor will not be bound to the terms of a contract absent an affirmative assumption

25   of the duties under the contract"); *E.I. DuPont de Nemours*, 269 F.3d at 200 (holding that non-

26   signatory was not bound to agreement because "there is no evidence that [non-signatory] embraced

27   the Agreement"); *You Map, Inc. v. Snap Inc.*, 2021 WL 106498, at *10 (D. Del. Jan. 12, 2021);

28   *Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 925853, at *9 (Del. Ch. Mar. 16, 2010). Accordingly,

1  Intel's license defense fails as a matter of law, and VLSI is entitled to summary judgment.

2        **3.    VLSI Is Also Entitled To Summary Judgment Because VLSI's Patents**

3              **Are Not "Finjan's Patents" As Defined In The Finjan Settlement**

4        Even assuming VLSI were somehow bound by the Finjan Settlement (it is not), Intel's

5  license defense would still fail based on the plain language of that contract. This is because VLSI's

6  patents—all of which were acquired from NXP in and after 2016 and involve semiconductor

7  technology, not cybersecurity software as was at issue in the cases that were settled via the 2012

8  Finjan Settlement—are not "Finjan's Patents" as defined in the Finjan Settlement. Ex. 3 (Stolarski

9  Decl.) ¶ 4; Ex. 1 (Settlement) at 16. Specifically, Section 1.10 defines "Finjan's Patents" as: ███

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████████"

14        Thus, for VLSI's patents to even potentially be considered "Finjan's Patents," the Court

15 would first have to find (contrary to the W.D. Texas Court's findings) that the term "Finjan" includes

16 VLSI, even though VLSI is not referenced in the Finjan Settlement, did not participate in its drafting,

17 did not exist until four years after it was signed, was not created by Finjan, and has no relationship

18 with Finjan. Ex. 1 (Settlement) at 15 & §§ 1.11, 1.12; Ex. 13 (Hartstein Depo.) at 98:6–16; Ex. 21

19 (Stabinsky Depo.) at 46:6–24, 28:15–29:3; Ex. 2 (LLC Agreement) at -638; Ex. 3 (Stolarski Decl.)

20 ¶ 3; *see also VLSI*, 2022 WL 1261322, at *3 ("VLSI has no relationship to Finjan whatsoever.").

21        As discussed above, Intel erroneously contends that the term "Finjan" should be interpreted

22 to include VLSI based on circular language in the Finjan Settlement concerning future "Affiliates."

23 But even assuming that VLSI and Finjan actually became "Affiliates" in 2020, which they did not,

24 under the circumstances presented here, the contract language cited by Intel does not transform

25 VLSI into Finjan. *E.g., Sheehan*, 2020 WL 2838575, at *9; *Quiz-Dia LLC*, 2017 WL 76997, at *6.

26        To the contrary, the plain language of the Finjan Settlement makes clear that Finjan was only

27 granting Intel a license to patents owned or controlled by Finjan at the time of the agreement (which

28 patents were specifically listed in an attachment to the contract), plus any patents subsequently

1   "██████████████ that were subsequently created during "██████████████████" and/or that

2   were subsequently "████████████████." Ex. 1 (Settlement) §§ 1.10, 3.4. It is undisputed that **none**

3   of those conditions is met here. The semiconductor patents that VLSI acquired from NXP in and

4   after 2016 and asserted against Intel were not inventions made by Finjan, nor by Finjan's

5   contractors, nor were they ever owned by Finjan. Ex. 3 (Stolarski Decl.) ¶¶ 4, 11; Ex. 13 (Hartstein

6   Depo.) at 99:10–14; Ex. 20 (Anderson Depo.) at 90:21–25; Ex. 21 (Stabinsky Depo.) at 88:9–11.

7   Additionally, even if one of those conditions were met (and none is met here), Section 1.10

8   of the Finjan Settlement expressly limits Finjan's obligation to provide Intel a license to future

9   patents "████████████████████████████████████████████████████

10   ████████████████████████." But Finjan has never had a right to grant licenses to VLSI's

11   patents, which originated with NXP, are owned by VLSI, and were never owned by Finjan.

12   Moreover, even assuming Finjan could somehow grant Intel a license to VLSI's patents

13   (which it cannot), Finjan certainly could not do so "████████████████████████████████

14   ████████████████ In this regard, non-party NXP is a public company that is unrelated to Finjan and

15   is indisputably a "████████ as that term is used in Section 1.10 of the Finjan Settlement. It is

16   likewise undisputed that NXP has an ongoing financial interest in the patents—as Intel has

17   repeatedly admitted, VLSI's patents cannot be licensed to Intel without VLSI being obliged to

18   provide consideration to NXP. Ex. 3 (Stolarski Decl.) ¶ 4; Ex. 10 (PPCA) at §§ 2.1, 7.3; Ex. 8

19   (Stolarski Depo.) at 227:24–228:20; Ex. 9 (Stolarski Depo.) at 146:12–14, 148:22–149:3. VLSI's

20   counsel are similarly "third persons" for purposes of the Finjan Settlement, and would also have a

21   right to consideration if VLSI's patents were licensed to Intel. Ex. 3 (Stolarski Decl.) ¶ 4.

22   Intel nonetheless proposes that property rights be stripped from VLSI, NXP and VLSI's

23   counsel and given, for no consideration, to Intel based on a 2012 contract between Intel and Finjan.

24   Nothing in the Finjan Settlement supports such an outcome. To the contrary, under the plain terms

25   of the Finjan Settlement, Intel would only be entitled to a license to VLSI's patents (assuming VLSI

26   were bound by the contract in the first place, which it is not) if Finjan had a right to grant such a

27   license without the requirement to pay consideration to any third person. Ex. 1 (Settlement) at

28   § 1.10. Here, that is indisputably not the case. Finjan cannot grant such a license, let alone without

1  owing consideration to VLSI, NXP and VLSI's counsel. *E.g.*, Ex. 20 (Anderson Depo.) at 90:7–25.

2  Thus, by definition, VLSI's patents are not "Finjan's Patents" under the Finjan Settlement.

3        In addition, as the W.D. Texas Court correctly found, far from VLSI being "Finjan" under

4  the Finjan Settlement, VLSI is not even an affiliate of Finjan as defined by the contract. 2022 WL

5  1261322, at *3 ("VLSI . . . is not an affiliate of Finjan."). Thus, the undisputed facts here show that

6  VLSI and Finjan are not under common ownership or common control. *E.g.*, ECF 471 ("VLSI has

7  disclosed that it is owned by CF VLSI Holdings LLC [and] VLSI Holdings is owned by ten

8  investment funds that are managed by affiliates of nonparty Fortress Investment Group LLC. VLSI

9  has identified the ten funds . . . [and] each of [the investors in those funds] individually owns less

10 than a 10% indirect interest in VLSI Holdings. . . . [Thus] even under the more conservative

11 approach, none of the individual investors in the funds has control over a party to the litigation.");

12 Ex. 2 (LLC Agreement) at -646; Ex. 13 (Hartstein Depo.) at 97:9–98:5, 108:23–109:4; Ex. 3

13 (Stolarski) ¶¶ 2–3, 7, 10; Ex. 8 at 108:10–109:8; Ex. 25 (Kessler Depo.) at 97:14–19; Ex. 26 § 4.1.

14       To the contrary, VLSI and Finjan are separate and independent entities that are in turn owned

15 by separate and independent investment entities. Finjan has never held any ownership interest in

16 VLSI, and VLSI has never held any ownership interest in Finjan. Further, VLSI and Finjan are run

17 separately, with their respective day-to-day decisions made by unrelated CEOs who do not work for

18 Fortress. Ex. 13 (Hartstein Depo.) at 97:9–12; 108:23–109:4; Ex. 3 (Stolarski Decl.) ¶¶ 2–3; Ex. 8

19 at 108:10–12; Ex. 26 at § 4.1.

20       Intel has previously argued that Fortress "controls" VLSI because Fortress has the

21 contractual ability to appoint VLSI board members. As an initial matter, that argument

22 fundamentally ignores the undisputed facts that Fortress does not own VLSI, but rather is acting as

23 the agent of the investors in VLSI's parent company.[5] Similarly, to the extent Fortress has

24

25

---

26 [5] To give but one example of why Intel's theory of "control" is erroneous and unsupportable, if the

27 Court appointed Professional 1 as receiver for Company A, and then in an unrelated case appointed

28 the same Professional 1 as receiver for Company B, under Intel's theory, Company A and Company

involvement with Finjan, it is in Fortress's capacity as the agent for the various investment funds that are invested in Finjan (which, again, are different entities than the investment funds that are invested in VLSI Holdings). As a matter of law, the fact that the investment entities that own VLSI Holdings and the different investment entities that own Goldfish have each independently hired Fortress does not remotely show that VLSI and Finjan are under common control. *See, e.g.*, *Amadeus Glob. Travel Distrib., S.A. v. Orbitz, LLC*, 302 F. Supp. 2d 329, 336–37 (D. Del. 2004) ("Delaware law . . . require[s] that control be actual."); *Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 943 F.3d 49, 56–60 (1st Cir. 2019).

Moreover, even assuming that, contrary to the actual facts of this case, Fortress owned VLSI (which it clearly does not) and selected all of VLSI's board members, as a matter of Delaware law, that still would not be sufficient to show that Fortress controls VLSI's board. *E.g., Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *12 (Del. Ch. Nov. 7, 2013) ("[T]he fact that [an entity] appoints or elects a majority of the directors does not entitle [that entity] to control the board . . . so as to undermine the directors' independence." (citing *Aronson v. Lewis*, 473 A.2d 805, 815–16 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000))).

Thus, even if Intel's license defense were not barred by res judicata and collateral estoppel (which it is), and even if VLSI were bound by the 2012 Finjan Settlement (which VLSI is not), VLSI would still be entitled to summary judgment of Intel's license defense on the basis that under the plain language of that contract, VLSI's patents acquired from NXP are not "Finjan's Patents."

## C.    CONCLUSION

For each of the foregoing reasons, VLSI respectfully submits that the Court grant VLSI's motion for summary judgment on Intel's license defense.

## III.    IPR ESTOPPEL

Pursuant to 35 U.S.C. § 315(e)(2) and the doctrine of inter partes review ("IPR") estoppel, Plaintiff VLSI Technology LLC ("VLSI") respectfully requests summary judgment of no invalidity

---

B would now be under "common control" such that a license to Company A's patents would also be a license to Company B's patents and vice versa. Obviously, that is not the law.

based on prior art combinations that Defendant Intel Corp. ("Intel") raised or reasonably could have raised during previous IPR proceedings. Specifically, VLSI requests summary judgment of no invalidity based on the six obviousness combinations discussed in paragraphs 771–961, 962–1096, and 1097–1132 of Dr. Apsel's opening report concerning the '922 Patent (Ex. 27) and paragraphs 139–188, 189–246, and 247–286 of Dr. Fay's opening report concerning the '672 Patent (Ex. 28).

Defendant Intel Corporation ("Intel") should be estopped from asserting six obviousness combinations in its expert reports, three concerning U.S. Patent No. 8,004,922 (the "'922 Patent"), and three concerning U.S. Patent No. 8,268,672 (the "'672 Patent"). Intel filed IPR petitions concerning the asserted claims of these patents in June 2018, which proceeded through Final Written Decision. *See* Final Written Decision at 2, *Intel Corp. v. VLSI Tech. LLC*, No. IPR2018-01033 (P.T.A.B. Feb. 6, 2020) ["'922 FWD"]; Final Written Decision at 2, *Intel Corp. v. VLSI Tech. LLC*, No. IPR2018-01107 (P.T.A.B. Feb. 10, 2020), *aff'd*, 843 F. App'x 321 (Fed. Cir. 2021) ["'672 FWD"]. Intel cannot now assert combinations that it "raised or reasonably could have raised during" those proceedings. 35 U.S.C. § 315(e)(2). The combinations addressed herein meet that standard. Summary judgment is therefore appropriate. *See, e.g.*, *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 995 (Fed. Cir. 2022), *cert. denied*, 143 S. Ct. 2658, *Apple, Inc. v. Cal. Inst. of Tech.* (2023).

### A. STANDARD FOR ESTOPPEL UNDER 35 U.S.C. § 315(e)(2)

A petitioner whose challenge to a patent claim in IPR results in a Final Written Decision cannot later assert in litigation "that the claim is invalid on any ground that the petitioner . . . reasonably could have raised during that inter partes review." 35 U.S.C. § 315(e)(2). "[E]stoppel applies not just to claims and grounds asserted in the petition and instituted for consideration by the Board, but to all grounds not stated in the petition but which reasonably could have been asserted against the claims in the petition." *Click-to-Call Techs. LP v. Ingenio, Inc.*, 45 F.4th 1363, 1370 (Fed. Cir. 2022) (quoting *Broadcom*, 25 F.4th at 991). The Federal Circuit recently clarified in *Broadcom* that, where it is "undisputed" that a patent challenger was "aware of the prior art references that [it] sought to raise in the district court when [it] filed its IPR petitions," "summary judgment . . . of no invalidity based on IPR estoppel" is warranted. 25 F.4th at 991, 995. If it is unclear whether the patent challenger knew about a certain reference when it filed its IPR petitions,

"§ 315(e)(2) estops a petitioner as to invalidity grounds a skilled searcher conducting a diligent search reasonably could have been expected to discover, as these are the grounds that the petition 'reasonably could have raised' in its petition." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1298 (Fed. Cir. 2023). The patent owner "bears the burden to prove" this fact. *Id.* at 1299.

Pursuant to 35 U.S.C. § 311(b), IPR estoppel applies to patents and printed publications, including those "that relate to and describe a physical product." *Wasica Fin. GMbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 453 (D. Del. 2020). Moreover, the defendant cannot "us[e] a physical device to argue invalidity if all of the material limitations of that device were disclosed in a patent or printed publication that the patent challenger either knew about or reasonably could have discovered." *Bos. Sci. Corp. v. Cook Grp. Inc.*, 2023 WL 1452172, at *34 (S.D. Ind. Jan. 31, 2023).

## B.   IPR ESTOPPEL BARS INTEL'S SECTION 103 OBVIOUSNESS ARGUMENTS CONCERNING THE '922 AND '672 PATENTS

Dr. Apsel's 35 U.S.C. § 103 obviousness analysis concerning the '922 Patent relies on the following combinations of prior art references: (1) "Nehalem, Gunther, and Willingham" (Ex. 27 ¶¶ 771–961); (2) "Rakshani and Willingham" (*id.* ¶¶ 962–1096); and (3) "Rakshani and Khellah" (*id.* ¶¶ 1097–1132). Dr. Fay's analysis concerning the '672 Patent combines: (4) "Okada," "Zakel," and the "Lee Book" (Ex. 28 ¶¶ 139–88); (5) "Okada," the "Lee Book," and the "Intel P1264 Package Process," (*id.* ¶¶ 189–246), and (6) "Pahl, Shibata, and Basol" (*id.* ¶¶ 247–86). Intel's experts discuss these references in paragraphs 407–603 of Dr. Apsel's reply report, Ex. 29, and paragraphs 49–139 of Dr. Fay's reply report, Ex. 30. Dr. Apsel and Dr. Fay also discuss them sporadically throughout their rebuttal reports. *See, e.g.*, Ex. 31 (Apsel Reb.) ¶ 379; Ex. 32 (Fay Reb.) ¶ 252. Attached to this Motion as Appendix A is a table concisely explaining why each combination is estopped.

### 1.   Intel Disclosed Nearly Every Prior Art Reference By June 2018

In its March 19, 2018 Invalidity Contentions and June 2018 IPR petitions, Intel disclosed nearly every asserted prior art reference Dr. Apsel and Dr. Fay rely on for their Section 103 analyses.

Intel challenged each asserted claim of the '922 and '672 Patents in June 2018. *See* Petition for Inter Partes Review of U.S. Patent No. 8,004,922 at 1, *Intel Corp. v. VLSI Tech. LLC*, No. IPR2018-01033 (P.T.A.B. June 21, 2018) ["'922 Petition"]; Petition for Inter Partes Review of U.S.

1  Patent No. 8,268,672 at 1, *Intel Corp. v. VLSI Tech. LLC*, No. IPR2018-01107 (P.T.A.B. June 13,

2  2018) ["'672 Petition"]. The PTAB issued Final Written Decisions in 2020, finding that Intel had

3  failed to show that the asserted claims were unpatentable. *See* '922 FWD at 2; '672 FWD at 2.

4      Intel disclosed, as prior art, all but two of its references at the time of its IPR petitions. Intel

5  disclosed U.S. Patent Nos. 7,723,867 ("Willingham"), 8,397,090 ("Gunther"), and 7,307,899

6  ("Khellah") in the '922 Petition. *See* '922 Petition at 3, 10. In the '672 Petition, Intel disclosed U.S.

7  Patent No. 6,070,788 ("Zakel"), U.S. Patent Application Publication No. 2002/0149117 ("Shibata"),

8  Japanese Patent Application JP-A 02-005455 ("Okada"), and Barbara Pahl et al., *A Thermode*

9  *Bonding Process for Fine Pitch Flip Chip Applications Down to 40 Micron*, 2001 Proceedings, Int'l

10 Symp. on Elec. Materials & Packaging ("Pahl"). *See* '672 Petition at 14, 16, 46. In its March 19,

11 2018 Invalidity Contentions, which predate the '922 and '672 Petitions, Intel disclosed U.S. Patent

12 No. 8,171,323 ("Rakshani"), U.S. Patent Application Publication No. 2004/0012090 ("Basol"), and

13 two Intel slide decks describing Intel's Nehalem processor. *See* Ex. 33 at 38 (disclosing "Rakshani"

14 and "Nehalem HC"), 39 (disclosing "Nehalem Presentation"), 62 (disclosing "Basol").

15     Intel was thus undisputedly "aware of the[se] prior art references" at the time it filed its IPR

16 petitions, and therefore "reasonably could have . . . asserted [them] against the claims included in

17 the petition[s]." *Broadcom*, 25 F.4th at 991. For three of the combinations Intel asserts, this situation

18 is identical to that in *Broadcom*, in which the Federal Circuit held that Apple and Broadcom were

19 estopped as a matter of law from asserting references they were "aware of . . . when Apple filed its

20 IPR petitions." *Id.*; *see also Singular Computing LLC v. Google LLC*, 2023 WL 2839282, at *6 (D.

21 Mass. Apr. 6, 2023) (finding alleged infringer "estopped from asserting invalidity based on the

22 printed publication and patent references identified in its invalidity contentions and claim charts").

23     Accordingly, the Court should grant summary judgment of no invalidity as to the following

24 obviousness combinations asserted by Intel: (1) Rakshani and Willingham (Ex. 27 (Apsel Rpt.) ¶¶

25 962–1096); (2) Rakshani and Khellah (*id.* ¶¶ 1097–1132); and (3) Pahl, Shibata, and Basol (Ex. 28

26 (Fay Rpt.) ¶¶ 247–286). These combinations consist entirely of references Intel explicitly disclosed

27 as prior art at the time it filed its IPR petitions, and are thus estopped under Section 315(e)(2).

28     Intel's remaining three obviousness combinations contain patents and prior art publications

1   Intel undisputedly disclosed as prior art at the time of its IPR petitions. In particular, Intel disclosed

2   Okada and Zakel in the '672 Petition and Gunther and Willingham in the '922 Petition. For the

3   reasons discussed below, the remaining combinations are likewise subject to IPR estoppel.

**2.      Intel Reasonably Could Have Raised The Lee Book In 2018**

5            Two of Intel's obviousness combinations for the '672 Patent include the Lee Book, a printed

6   publication under 35 U.S.C. § 311(b). As noted above, VLSI must make a *prima facie* showing that

7   Intel was aware of or reasonably could have raised the Lee Book at the time it filed the '672 Petition.

8   *See Ironburg*, 64 F.4th at 1299. Upon that showing, "the burden will be on [Intel] . . . to show that

9   it could not have reasonably [] raised [the Lee Book] in the IPR." *Palomar Techs., Inc. v. MRSI Sys.,*

10  *LLC*, 2020 WL 2115625, at *4 (D. Mass. May 4, 2020). Intel cannot make such a showing.

11           ***First***, Intel was aware of the Lee Book by 2012, when its employees cited it in publications.

12  Five Intel employees, including Rajen C. Dias, "a Principal Engineer," and Deepak Goyal, "the

13  Manager of the Assembly Technology Development Quality and Reliability Laboratories," cited the

14  Lee Book in Yan Li et al., *Lead-Free Solder Joint Void Evolution During Multiple Subsequent High-*

15  *Temperature Reflows*, 12 *IEEE Transactions on Device and Materials Reliability* 494, 497 n.4, 499–

16  500 (2012) (Ex. 34) [Li Paper]. Also, Johanna M. Swan, one of only 120 Intel Fellows, and other

17  Intel engineers, provided "close collaborations" and "supervisi[on]" on a work citing the Lee Book.

18  *See* Ming Kong, *Experimental and Modeling Studies on Solder Self-Alignment for Optoelectronic*

19  *Packaging*, at vi, 78, 171 (2012) (Ph.D. dissertation, University of Colorado) ["Kong Dissertation"]

20  (acknowledging "coworkers of the project," "supported by the Intel Corp."); *cf. Potter Voice Techs.,*

21  *LLC v. Apple Inc.*, 24 F. Supp. 3d 882, 886 (N.D. Cal. 2014) ("It is well established that corporations

22  act through their employees and an agent's knowledge will generally be imputed to the corporate

23  principal so long as employees are acting within the scope of their employment.").

24           ***Second***, even if Intel were unaware of the Lee Book six years after the Li Paper and Kong

25  Dissertation, a "skilled searcher conducting a diligent search reasonably could have been expected

26  to discover" it. *See Ironburg*, 64 F.4th at 1298. Intel's own library expert Dr. Hall-Ellis opined that

27  the Lee Book would have been "publicly accessible to ordinarily ***skilled and interested researchers***

28  in the field" as early as 2001. Ex. 35 (Hall-Ellis Rpt.) ¶¶ 134, 137. No expert has presented any

1    argument to the contrary; nor could they. With over 340 academic citations, the Lee Book is well

2    known, oft-cited, and easy to locate. *See* Ex. 36. On Amazon.com, for example, a search for "Reflow

3    soldering books" results in the Lee Book appearing as the first non-sponsored result. Ex. 37.

4        ***Third***, Intel did locate and cite the Lee Book in its January 24, 2022 Invalidity Contentions,

5    Ex. 38 at 54, which is "compelling evidence itself that [Intel] reasonably could have discovered [it]

6    through a diligent search" earlier, *see Wi-Lan Inc. v. LG Elecs., Inc.*, 421 F. Supp. 3d 911, 925 (S.D.

7    Cal. 2019); *see also Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, 2022 WL 4132441, at *11

8    (N.D. Ill. Sept. 12, 2022) ("Because these references were 'found in a later prior art search, there is

9    a reasonable inference that [they] could have been found earlier by a skilled searcher.'" (quoting

10   *GREE, Inc. v. Supercell Oy*, 2020 WL 4999689, at *5 (E.D. Tex. July 9, 2020))).

11       "[T]here is no reasonable argument that [Intel] could not have raised" the Lee Book, a

12   reference its own expert opined was accessible to "skilled and interested researchers in the field"

13   over two decades ago, in the '672 Petition. *Click-to-Call*, 45 F.4th at 1370; Ex. 35 (Hall-Ellis Rpt.)

14   ¶¶ 134, 137. Intel cannot raise any genuine issue of material fact here, as it would need to contradict

15   its own expert's opinions, as well as explain why it was able to find the Lee Book in 2022 but could

16   not have reasonably done so in 2018. Accordingly, VLSI is entitled to summary judgment of no

17   invalidity concerning Intel's combination of Okada, Zakel, and the Lee Book. *See* Ex. 28 (Fay Rpt.)

18   ¶¶ 139–188 (labeling Okada and Zakel "Applicant Admitted Prior Art"); *see also* Section A, *supra*.

19            **3.    Intel Improperly Attempts To Circumvent IPR Estoppel By Relying**

20                   **On Prior Art "Products"—The Nehalem Processor And P1264 Process**

21       Intel's fifth and sixth combinations purport to rely on "product" prior art: namely, the

22   Nehalem processor and the P1264 process. However, where a defendant claims to rely on "product"

23   or "system" prior art, estoppel still applies when "the relevant claim limitations . . . [are] adequately

24   described in [] publicly available documents." *Avanos Med. Sales, LLC v. Medtronic Sofamor Danek*

25   *USA, Inc.*, 2021 WL 8693677, at *2 (W.D. Tenn. Oct. 8, 2021). Courts around the country have

26   held this to be the case when the system is not materially different from prior art references. *E.g.*,

27   *Bos. Sci.*, 2023 WL 1452172, at *34 ("[A] patent challenger will be estopped from using a physical

28   device to argue invalidity if all of the material limitations of that device were disclosed in a patent

1   or printed publication that the patent challenger either knew about or reasonably could have

2   discovered[.]"); *Wasica*, 432 F. Supp. 3d at 455 (granting summary judgment of IPR estoppel where

3   a "prior art publication [] reasonably could have been raised in the IPR and is materially identical

4   (i.e., discloses the same claim elements) to the [prior art product]"); *Hafeman v. LG Elecs., Inc.*,

5   2023 WL 4362863, at *1 (W.D. Tex. Apr. 14, 2023) ("[E]stoppel still applies when the allegedly

6   new references have 'materially identical' disclosures as the IPR art.").

7        To evaluate whether product prior art references are subject to IPR estoppel, courts "attempt

8   to discern if a patent challenge[r] is simply swapping labels for what is otherwise a patent or printed

9   publication invalidity ground in order to 'cloak' its prior art ground and 'skirt' estoppel." *Cal. Inst.*

10  *of Tech. v. Broadcom Ltd.*, 2019 WL 8192255, at *7 (C.D. Cal. Aug. 9, 2019). Estoppel may not

11  apply when the defendant offers "a physical product." *Willis Elec. Co. v. Polygroup Macau Ltd.*

12  *(BVI)*, 2023 WL 112733, at *19 (D. Minn. Jan. 5, 2023). In such cases, "the physical device must

13  provide a substantive difference to the challenger's invalidity argument that would not have been

14  available by solely relying on the patents and publications describing the device," as absent that

15  difference the product would be "materially identical to [an] estopped reference." *Bos. Sci.*, 2023

16  WL 1452172, at *33, *36 (estopping prior art product where the defendants "rel[ied] almost

17  exclusively on [a patent] in describing the . . . device and how it works" and "all of the limitations

18  that [d]efendants identif[ied] in the device . . . [were] disclosed in the [prior art] patent"); *see also*

19  *Avanos*, 2021 WL 8693677, at *2 ("[T]he inquiry is whether the non-public documentation or

20  physical product is the only available material that cites certain limitations.").

21       Here, despite facially relying on Nehalem and P1264, neither Dr. Apsel nor Dr. Fay actually

22  examined a physical Nehalem product or the P1264 process for their analyses, instead relying on

23  Intel documents describing these products. *See generally* Ex. 39 (Apsel Rpt. Ex. B) at 1–26 (not

24  listing any physical products as "Materials Considered"); Ex. 40 (Fay Rpt. App'x B) at 1–5 (same).

25  That is insufficient to evade IPR estoppel. *See Bos. Sci.*, 2023 WL 1452172, at *33 ("[T]he patent

26  challenger must, at least in part, substantively rely on the actual physical specimen to escape IPR

27  estoppel."). As Intel's experts did not look at the actual Nehalem processor or examine the P1264

28  process, Intel should be estopped from relying on the ***documents*** its experts did review.

<em>a.      Intel Relies Solely On Prior Art Publications Describing Nehalem</em>

Dr. Apsel's analysis of the Nehalem processor for the Gunther, Willingham, and Nehalem combination relies entirely on printed publications that describe Nehalem, not a physical Nehalem processor. The vast majority of her analysis relies on the "Nehalem HC" and "Nehalem IDF" slide decks. Dr. Apsel relies on these slide decks for every element she argues the Nehalem processor discloses in her obviousness analysis. *E.g.*, Ex. 27 (Apsel Rpt.) ¶ 777 ("▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉); *id.* ¶ 793 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

The Nehalem HC and Nehalem IDF slide decks are publicly-available prior art publications Intel disclosed in its March 19, 2018 Invalidity Contentions. Ex. 33 at 38–39 (disclosing "Nehalem HC" and Nehalem IDF as "Nehalem Presentation"). Intel admits these decks were available to the public interested in the art no later than August 2008, and hence were printed publication prior art to the '922 Patent under at least under 35 U.S.C. § 102(a). *See* Ex. 27 (Apsel Rpt.) ¶¶ 777 n.24, 778 n.25 (Nehalem IDF and Nehalem HC were "publicly available" and "shared publicly" in August 2008); *see also In re Klopfenstein*, 380 F.3d 1345, 1350–52 (Fed. Cir. 2004) ("slides" were "sufficiently publicly accessible to count as a 'printed publication'" even though they were "never distributed to the public and [were] never indexed"); *cf. In re Enhanced Sec. Rsch., LLC*, 739 F.3d 1347, 1354–55 (Fed. Cir. 2014) (finding product manual a prior art printed publication).

Although these Intel printed publications "relate to and describe a physical product," Intel could have asserted them in IPR; it just chose not to do so. *See Wasica*, 432 F. Supp. 3d at 453. Accordingly, use of these prior art publications should be estopped. Just as in *Wasica*, in which the court estopped the use of a prior art reference that "reasonably could have been raised during the IPR" and "disclose[d] each claim element allegedly shown by the [prior art product]," here, Dr. Apsel relies on the Nehalem HC and Nehalem IDF prior art publications for every claim element the Nehalem processor allegedly discloses in her obviousness analyses. *Id*; *see also Bos. Sci.*, 2023 WL 1452172, at *33 ("A patent challenger cannot rely solely on otherwise estopped printed publications or patents to describe how a physical device works and then argue that they are actually relying on a physical device."). *See generally* Ex. 27 (Apsel Rpt.) ¶¶ 771–961.

1    Dr. Apsel's Nehalem obviousness analysis also includes occasional citations to an "Intel

2  Tech Journal" document dated in 2010, after the undisputed 2009 priority date for the '922 Patent.

3  The "Intel Tech Journal" document is not prior art, and Dr. Apsel relies on it exclusively to bolster

4  her discussion of Nehalem HC and Nehalem IDF. *See, e.g.*, Ex. 27 ¶ 780 ███████████

5  ███████████████████████████████████████████████████

6  Moreover, for each limitation in which Dr. Aspel relies on a figure from the Intel Tech Journal, she

7  first relies one or both of Nehalem HC or Nehalem IDF. *See generally id.* ¶¶ 771–961. *See also*

8  *Avanos*, 2021 WL 8693677, at *1 ("[I]f there is a prior art publication that 'discloses the same claim

9  elements' as the product in question, estoppel still applies because the grounds for asserting

10  invalidity could still have been raised in the IPR." (quoting *Wasica*, 432 F. Supp. 3d at 453–54)).

11    In sum, Dr. Apsel's use of Nehalem IDF and Nehalem HC should be estopped; there can be

12  no genuine dispute that these are prior art publications that were available to Intel in June 2018.

13  Although "the Nehalem processor" is an alleged prior art product, every element of Dr. Apsel's

14  analysis of it is informed and supported by Nehalem IDF and Nehalem HC , just like the experts'

15  use of a "Nu-Tip" device was reliant on a prior art patent in *Boston Scientific*. 2023 WL 1452172,

16  at *36. Intel could have made the same arguments it makes now in its petition using Gunther,

17  Willingham, and Nehalem HC and Nehalem IDF, meaning the Nehalem processor provides no

18  "substantive difference to [Intel's] invalidity argument that would not have been available by solely

19  relying on" the slide decks. *Id.* at *33. The fact that prior art publications describe a product is not

20  a backdoor to Section 315(e)(2)'s estoppel provision. *See Milwaukee Elec. Tool Corp. v. Snap-On*

21  *Inc.*, 271 F. Supp. 3d 990, 1032 (E.D. Wis. 2017) ("Snap–On cannot skirt [IPR estoppel] by

22  purporting to rely on a device without actually relying on the device itself."); *see also Cal. Inst. of*

23  *Tech.*, 2019 WL 8192255, at *7 ("agree[ing]" with *Milwaukee Electric*). Summary judgment should

24  be granted to VLSI on Gunther, Willingham, and Nehalem. Ex. 27 (Apsel Rpt.) ¶¶ 771–961.

25              b.    *Intel's Reliance On The P1264 Process Is Entirely Duplicative Of*

26                    *Okada And The Lee Book*

27    Dr. Fay relies on the P1264 process in combination with Okada and the Lee Book. Ex. 28

28  ¶¶ 189–246. His understanding of the P1264 process stems from confidential "[d]ocuments

1    produced by Intel." *Id.* ¶ 119; *see also id.* ¶ 200 n.285 (citing 89699MDOC00000319, marked

2    "OUTSIDE COUNSEL EYES ONLY"). Under these circumstances, estoppel still applies if the

3    expert could have cited prior art publications for "the same claim elements," including publications

4    describing P1264 and Intel's corresponding 65nm architecture. *See Wasica*, 432 F. Supp. 3d at 455;

5    *see also Avanos*, 2021 WL 8693677, at *2 ("Here, the relevant claim limitations . . . were adequately

6    described in the publicly available documents[.]"); *Bos. Sci.*, 2023 WL 1452172, at *33, *36.

7          ***First***, Dr. Fay does not rely on the P1264 process to disclose any claim element that is not

8    also disclosed by the Lee Book or Okada, making the P1264 process superfluous. Dr. Fay's analysis

9    of Claim 1, for example, only relies on P1264 for element [1-B], which is also purportedly taught

10   by Okada and the Lee Book. *See* Ex. 28 (Fay Rpt.) ¶ 205 ("Okada, P1264, and Lee Book teach that

11   element [1-B] was known in the art."). Throughout Dr. Fay's discussion, the P1264 process appears

12   as little more than an afterthought, bolstering his discussion of the Lee Book. *See, e.g., id.* ¶ 238 █

13   ████████████████████████████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████████████████████████ Intel

15   cannot escape *Broadcom* and *Ironburg* by "combin[ing] any evidence that it could not have

16   presented at the IPR proceeding with any printed publications or patents." *Singular Computing*,

17   2023 WL 2839282, at *4. IPR estoppel applies to Dr. Fay's duplicative use of the Lee Book.

18         ***Second***, even if Dr. Fay's use of the P1264 process were not duplicative of Okada and the

19   Lee Book, the elements Dr. Fay draws on P1264 for were disclosed in prior art printed publications

20   written by Intel engineers, meaning Intel reasonably could have raised these same arguments during

21   IPR. *See Avanos*, 2021 WL 8693677, at *2 (noting that, were the opposite true, "nearly any entity

22   with confidential documents describing its product could get around IPR estoppel"); *Wasica*, 432 F.

23   Supp. 3d at 455; *Bos. Sci.*, 2023 WL 1452172, at *33. After all, it was Dr. Fay who first asserted

24   that "the Intel P1264 Package Process, which included the use of a copper metallization on the die

25   side interconnect, was described in printed publications . . . no later than 2005." Ex. 28 ¶ 120.

26

27

28

1      Dr. Fay uses internal documents describing P1264 to show that "████████████

2 ████████████████████████████████████████████████████████." *Id.*

3 ¶ 206. He provides an illustration, outlining the copper die bump in yellow, reproduced below. *Id.*

4 ¶ 200. A 2006 paper by Intel engineers discussing the use of copper die bumps in Intel's 65nm

5 architecture (which the P1264 process manufactured), however, also describes "the integration of

6 Cu bumps on the die side," and provides a similar illustration of a copper die bump in grayscale:



Figure 1  SEM cross section of a Cu die bump mated to eutectic SnPb solder.

15 Ex. 41 at 1611, A. Yeoh et al., *Copper Die Bumps (First Level Interconnect) and Low-K Dielectrics*

16 *in 65nm High Volume Manufacturing*, 56th Elec. Components & Tech. Conf. (2006) ["Yeoh"].

17      Intel could have made the same arguments to the PTAB using just Okada and the Lee Book.

18 But even if the P1264 process were required to make these arguments, Intel could have relied on

19 Yeoh to disclose the use of copper die bumps in Intel's 65nm manufacturing process. Intel should

20 not be permitted to use Okada and the Lee Book, prior art references it reasonably could have raised

21 during IPR, simply because Dr. Fay superficially combines them with P1264. *See Avanos*, 2021 WL

22 8693677, at *2. Intel cannot dispute that Dr. Fay does not rely on P1264 for a single element that it

23 does not also rely on Okada or the Lee Book for. Intel also cannot dispute that it could have raised

24 Yeoh, a prior art publication written by its own engineers, during IPR to disclose the use of copper

25 die bumps. Summary judgment should be granted to VLSI on this combination. Ex. 28 ¶¶ 189–246.

26 **C.**    **CONCLUSION**

27      Based on the foregoing, VLSI respectfully requests that the Court grant summary judgment

28 of no invalidity, as set forth below in Appendix A to VLSI's Motion.

1

Dated: August 24, 2023

2

Respectfully submitted,

By: */s/ Charlotte J. Wen*

3

4

IRELL & MANELLA LLP
Morgan Chu (SBN 70446)

5

Benjamin W. Hattenbach (SBN 186455)
Amy E. Proctor (SBN 283845)

6

Dominik Slusarczyk (SBN 287084)
Elizabeth C. Tuan (SBN 295020)

7

Charlotte J. Wen (SBN 313572)

8

Benjamin Manzin-Monnin (SBN 325381)
Nicolette Shamsian (SBN 341466)

9

Erick R. Franklund (SBN 348400)
**IRELL & MANELLA LLP**

10

1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276

11

Telephone: (310) 277-1010

12

Facsimile: (310) 203-7199
Email: mchu@irell.com

13

Email: bhattenbach@irell.com
Email: aproctor@irell.com

14

Email: dslusarczyk@irell.com
Email: etuan@irell.com

15

Email: cwen@irell.com

16

Email: bmonnin@irell.com
Email: nshamsian@irell.com

17

Email: efranklund@irell.com

18

Babak Redjaian (SBN 185506)

19

Kamran Vakili (SBN 284441)
Dennis J. Courtney (SBN 307646)

20

**IRELL & MANELLA LLP**
840 Newport Center Drive, Suite 400

21

Newport Beach, CA 92660-6324
Telephone: (949) 760-0991

22

Facsimile: (949) 760-5200

23

Email: bredjaian@irell.com
Email: kvakili@irell.com

24

Email: dcourtney@irell.com

25

*Counsel for Plaintiff*

26

VLSI TECHNOLOGY LLC

27

28

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that a true and correct copy of the foregoing document has been served via

3    electronic mail on August 24, 2023 on counsel of record for Intel Corp. I certify under penalty of

4    perjury and the laws of the United States that the foregoing is true and correct.

5

6    Dated: August 24, 2023                          ___/s/ Erick R. Franklund___
                                                              Erick R. Franklund
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Appendix A**

| Intel Combination | Prior Art Status | Why Intel Could Have Brought In IPR |
|---|---|---|
| Rakshani + Khellah (Apsel Rpt. ¶¶ 1097–1132) | Patent prior art under, e.g., 35 U.S.C. § 102(e). | Rakshani disclosed in Intel March 19, 2018 Invalidity Contentions. Ex. 33 at 38:3–4. <br><br> Khellah disclosed in IPR Petition. IPR2018-01033, Paper 3 ('922 Petition) at 10. |
| Rakshani + Willingham (Apsel Rpt. ¶¶ 962–1096) | Patent prior art under, e.g., 35 U.S.C. § 102(e). | Rakshani disclosed in Intel March 19, 2018 Invalidity Contentions. Ex. 33 at 38:3–4. <br><br> Willingham disclosed in IPR Petition. IPR2018-01033, Paper 3 ('922 Petition) at 3. |
| Pahl + Shibata + Basol <br><br> (Fay Rpt. ¶¶ 112–30). | Pahl is printed publication prior art under, e.g., 35 U.S.C. § 102(a). <br><br> Shibata and Basol are prior art United States patent applications under, e.g., 35 U.S.C. § 102(e). | Pahl and Shibata disclosed in IPR petition. *See* IPR2018-01107, Paper 2 ('672 Petition) at 7. <br><br> Basol disclosed in Intel March 19, 2018 Invalidity Contentions. Ex. 33 at 62:10–11. |
| Okada + Zakel + Lee Book <br><br> (Fay Rpt. ¶¶ 139–88) | Okada is a foreign prior art patent under, e.g., 35 U.S.C. § 102(d). <br><br> Zakel is patent prior art under, e.g., 35 U.S.C. § 102(e). <br><br> The Lee Book is a prior art printed publication under, e.g., 35 U.S.C. § 102(a). | Okada and Zakel disclosed in IPR petition. *See* IPR2018-01107, Paper 2 ('672 Petition) at 12, 16. <br><br> Lee Book both known by and reasonably available to Intel at the time it filed its IPR petition. *See* Ex. 34 (Li) at 497 n.4 (Senior Intel engineers citing Lee Book in 2012); Ex. 35 (Hall-Ellis Rpt.) ¶¶ 134, 137 (Lee Book publicly accessible in 2001 to "ordinarily skilled and interested researchers in the field"). |

| Intel Combination | Prior Art Status | Why Intel Could Have Brought In IPR |
|---|---|---|
| <u>Nehalem</u> + <u>Gunther</u> + <u>Willingham</u><br><br>(Apsel Rpt. ¶¶ 771–961) | Gunther and Willingham are patent prior art under, e.g., 35 U.S.C. § 102(e).<br><br>"Nehalem HC" and "Nehalem IDF" are printed publication prior art under, e.g., 35 U.S.C. § 102(a). | Gunther and Willingham disclosed in IPR Petition. IPR2018-01033, Paper 3 ('922 Petition) at 3.<br><br>Nehalem HC and Nehalem IDF are Intel documents, disclosed in Intel March 19, 2018 Invalidity Contentions. Ex. 33 at 38:24–26 (Nehalem HC); *id.* at 39:8–12 (Nehalem IDF as "Nehalem Publication"). |
| <u>Okada</u> + <u>Lee Book</u> + <u>P1264</u><br><br>(Fay Rpt. ¶¶ 189–264) | Okada is a foreign prior art patent under, e.g., 35 U.S.C. § 102(d).<br><br>The Lee Book is printed publication prior art under, e.g., 35 U.S.C. § 102(a).<br><br>The relevant elements in P1264 to Dr. Fay's analysis were disclosed in Yeoh, which is printed publication prior art under, e.g., 35 U.S.C. § 102(a). | Okada disclosed in IPR petition. *See* IPR2018-01107, Paper 2 ('672 Petition) at 16.<br><br>Lee Book both known by and reasonably available to Intel at the time it filed its IPR petition. *See* Ex. 34 (Li) at 497 n.4 (Senior Intel engineers citing Lee Book in 2012); Ex. 35 (Hall-Ellis Rpt.) ¶¶ 134, 137 (Lee Book publicly accessible in 2001 to "ordinarily skilled and interested researchers in the field").<br><br>Use of P1264 entirely duplicative of Okada and Lee Book. Any relevant elements of Intel's 65nm manufacturing process adequately disclosed in Yeoh, published by Intel engineers in 2006. *See* Ex. 41. |